1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11   MARIANGELA MARCONI HINRICHS,        No. EDCV 13-01256 SS

12                    Plaintiff,

13        v.

                                         **MEMORANDUM  DECISION  AND  ORDER**
14   CAROLYN W. COLVIN,
     Acting Commissioner of the
15   Social Security Administration,

16                    Defendant.

17

18

19                         **INTRODUCTION**

20

21        Mariangela Hinrichs ("Plaintiff") seeks review of the final

22   decision   of   the   Commissioner   of   the   Social   Security

23   Administration (the "Commissioner" or the "Agency") denying her

24   Disability Insurance Benefits and Supplemental Security Income.

25   The parties consented, pursuant to 28 U.S.C. § 636(c), to the

26   \\

27   \\

28

jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on June 7, 2010. (Administrative Record ("AR") 213). She alleged a disability onset date of June 3, 2010.[1] (AR 213, 222). The Agency denied Plaintiff's applications on January 12, 2011, and upon reconsideration on May 24, 2011. (AR 158, 167). On June 14, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 173). Plaintiff appeared and testified at a hearing before ALJ Lynn Ginsberg on March 27, 2012. (AR 27-71). On April 13, 2012, the ALJ issued a decision denying Plaintiff DIB and SSI. (AR 7-21).

Plaintiff timely filed a request for review of the ALJ's unfavorable decision on May 1, 2012, which the Appeals Council denied on May 17, 2013. (AR 1, 5). On July 16, 2013, Plaintiff filed the instant action.

---

[1] Plaintiff makes inconsistent claims as to her disability onset date. In her application, she stated that her conditions became severe enough to keep her from working as of November 1, 2009. (AR 226). However, Plaintiff also stated that she was able to work until June 3, 2010, seven months later. Id. For the sake of clarity the Court will refer to June 3, 2010 as the disability onset date.

# III.

## FACTUAL BACKGROUND

Plaintiff was born on March 11, 1960. (AR 222). She was fifty years old as of the alleged disability onset date and fifty-two years old at the time of her hearing before the ALJ. (AR 32, 222). Plaintiff graduated from college in 1986 (AR 227) and was a medical social worker with a home health care agency in Wisconsin until June 3, 2010, prior to filing for disability benefits. (AR 237, 274). Plaintiff worked as a social worker for more than twenty years. (AR 530). Plaintiff first sought treatment in April 2009 (AR 485) and alleges that her ailments became severe enough to prevent her from working on November 1, 2009.[2] (AR 226). However, because Plaintiff's husband was unemployed, Plaintiff "forced [herself] to continue working despite feeling awful most days," resigning only once her husband had found a new job. (AR 226). Plaintiff submitted her application for disability benefits on June 7, 2010, four days after she stopped working, and listed her illnesses as fibromyalgia, chronic obstructive pulmonary disease ("COPD"), sleep apnea, obesity, depression, and thyroid cancer. (AR 213, 226). Approximately one month later, in July 2010, Plaintiff and her family moved to California. (AR 34).

---

[2]  The ALJ's Decision cites August 18, 2009 as the earliest treatment date. (AR 18). However, Plaintiff's treatment records show that she sought treatment for aches, edema, and shortness of breath on April 1, 2009 (AR 485), and these conditions are among those Plaintiff later cited as contributing to her disability. Previously, Plaintiff had undergone a total thyroidectomy operation on July 23, 2008. (AR 343).

**A.   Medical History And Treating Doctors' Opinions**

   **1.   Physical Condition**

      a.   Dr. Cynthia Weisflock

   On August 18, 2009, Plaintiff saw Dr. Cynthia Weisflock at ThedaCare Physicians, a clinic located in Tigerton, Wisconsin.[3] Plaintiff complained of shortness of breath and difficulty swallowing.  (AR 479).  Plaintiff stated that she was not receiving treatment for previously diagnosed COPD, which Dr. Weisflock attributed, in part, to Plaintiff's smoking.  (AR 481-82).  Dr. Weisflock prescribed inhalers and advised Plaintiff to stop smoking.  (AR 482).  Dr. Weisflock expressed satisfaction with Plaintiff's heart function (AR 481) and noted that Plaintiff reported her edema improved when she wore anti-embolism stockings and took one of her husband's "water pills."  (AR 482).

   On September 25, 2009, Plaintiff saw Dr. Weisflock a second time, now complaining of multiple body aches that had allegedly been present for several years.  (AR 472).  Plaintiff had pain at thirteen of the eighteen fibromyalgia points.[4]   Based on

---

[3]   Plaintiff lived in Wisconsin before moving to California in July 2010.  (AR 34).

[4]   When determining whether a patient has fibromyalgia, doctors examine eighteen fixed locations ("points") on the body.  Doctors press each point firmly to see if the patient flinches.  Generally, if a patient flinches after compression of eleven or more points, she will be diagnosed with fibromyalgia.  See Rollins v. Massanari, 261 F.3d 853, 863 (9th Cir. 2001).

4

1  Plaintiff's symptoms, Dr. Weisflock diagnosed Plaintiff with
2  fibromyalgia and prescribed Cymbalta for her pain. (Id.)

3

4      On March 17, 2010, Plaintiff visited an endocrinologist as a
5  follow-up to her 2008 thyroid operation.[5]  (AR 383). The
6  examination revealed thyroid levels "within goal range," well-
7  healed scar tissue from the operation, and no need for a change
8  in Plaintiff's Synthroid dosage. (AR 383-84). Despite
9  Plaintiff's assertion that she had difficulty breathing, the
10 endocrinologist found Plaintiff's respiratory effort normal,
11 though she noted some wheezing; she also noted "1+ pitting edema
12 at the ankles." (Id.)

13

14     On March 22, 2010, Plaintiff again complained of shortness
15 of breath. (AR 389). Dr. Weisflock observed "few expiratory
16 wheezes and rhonchi" and noted that Plaintiff was already
17 scheduled to see a pulmonologist the next day.[6]  (AR 389-90).
18 Plaintiff asserted that she had last smoked on February 14, 2010.
19 (AR 389).

20

21         b.  Dr. Michael Maguire

22

23     Plaintiff visited pulmonologist Michael Maguire, M.D. on
24 March 23, 2010. (AR 423-24). Dr. Maguire observed that

25 _____

26 [5]  Dr. Pamela Baeten examined Plaintiff on this visit.
   However, her report was addressed to Dr. Weisflock for review.
27 (AR 383-84).

28 [6]  Plaintiff's pulmonologist visit is discussed below.

1    Plaintiff's chest x-ray was clear, that she exhibited no coughing
2    or wheezing, and that Plaintiff said "her inahlers had helped."
3    (AR 423).   A pulmonary function test found Plaintiff's lung
4    volumes within normal limits, although the laboratory report
5    noted that a "[m]ild restrictive defect is suggested but not
6    confirmed by lung volumes." (AR 428).   Though Plaintiff's weight
7    gain and "mild restriction" of pulmonary functions likely
8    contributed to her shortness of breath, Dr. Maguire concluded
9    that these were "well out-of-proportion to the pulmonary function
10   testing." (Id.).   He prescribed a nocturnal polysomnogram on the
11   theory that Plaintiff suffered from a nighttime breathing
12   disorder.  (AR 432).

14       The subsequent sleep study, conducted on April 1, 2010,
15   revealed a severely elevated apnea index of 107.5.   (AR 420).
16   However, when Plaintiff next visited Dr. Maguire, on June 1,
17   2010, she reported that she had experienced a "remarkable
18   improvement" in her shortness of breath after using a continuous
19   positive airway pressure ("CPAP") machine for a short period of
20   time. (AR 418).   Nevertheless, Plaintiff told Dr. Maguire that
21   the improvement had subsided "due to all the stress in her life,"
22   and that inhalers also were not helping much. (Id.).   Dr. Maguire
23   diagnosed Plaintiff with severe obstructive sleep apnea syndrome
24   and COPD related to her weight and tobacco use.[7]   (AR 419).   He

---

[7]    The ALJ's Decision appears to be in error as to the date of
Dr. Maguire's sleep apnea diagnosis, erroneously recording it as
June 6, 2010.  (Compare AR 18 and 419).

opined that "weight loss and exercise are going to help [Plaintiff] more than anything else," and did not alter Plaintiff's medications.  (AR 419).

### c.   Apple Medical Group

Plaintiff first visited Apple Medical Group ("AMG") on August 2, 2010, after she moved to California.[8]  (AR 524-25). The treating physician found that Plaintiff could expend normal respiratory effort with no cough and that she exhibited neither cardiovascular irregularities nor abdominal pain.  (AR 525).  The physician noted edema in Plaintiff's legs but reported that Plaintiff denied pain in her extremities, other than tenderness "when someone touches her skin."  (Id.).  The treatment report noted that Plaintiff was taking Cymbalta for fibromyalgia and that she suffered from COPD and sleep apnea.  (AR 524-25).  The physician found Plaintiff "negative for fatigue."  (AR 524).

Twelve days later, however, Plaintiff returned to AMG complaining that her fibromyalgia symptoms were worsening, with "burning" or "tingling" in her hands.  (AR 521-22).  Her other symptoms were unchanged, and she remained "negative" for fatigue, as well as for cough, dyspnea, wheezing and chest pain.  (Id.). On her next visit to AMG, on October 12, 2010, Plaintiff reported that her hips were beginning to hurt and her pain medications

---

[8]   The record does not indicate which doctor(s) treated Plaintiff at AMG, but Plaintiff's subsequent referral for laboratory tests came from AMG physician Surya Reddy, M.D.

1   were no longer effectively controlling her pain. (AR 557).

2   Plaintiff was referred to a rheumatologist.[9] (Id.).

3

4      On December 15, 2010, Plaintiff reported feeling better

5   after taking Prednisone. (AR 561). On August 22, 2011, on a

6   follow-up visit related to her postoperative hypothyroid

7   condition, Plaintiff was "doing fairly well," and her weight had

8   dropped to 365 pounds with exercise, although she reported

9   fatigue.[10] (AR 680-81). She still had no abdominal or chest

10   pain, but reported back pain.[11] (Id.) On March 2, 2012, however,

11   Plaintiff weighed 420 pounds, complained of moderate back pain

12   that radiated to her extremities, and said that her daily

13   activities aggravated the pain. (AR 683). Plaintiff told her

14   physician that she not only smoked but that she had "never tried

15   to stop smoking." (AR 683). This statement contradicts

16   Plaintiff's earlier reports to several physicians that she had

17   stopped smoking on February 14, 2010. (See, e.g. AR 389, 423).

18   Plaintiff requested pain medication and was prescribed Naproxen.

19   (AR 683, 685).

20   \\

21   \\

22

23   ――――――――――――

24   [9]   Plaintiff's rheumatologist visit is discussed below.

25   [10]   Plaintiff's counsel told the ALJ that Plaintiff weighed at

26   least 350 pounds at all relevant times. (AR 32).

27   [11]   This appears to be the first mention of back pain in the

28   patient's medical record, although she had previously reported
generalized pain related to her fibromyalgia.

1              d.   Dr. Dharmarajan Ramaswamy

2

3       Plaintiff   first   visited   rheumatologist   Dharmarajan

4  Ramaswamy, M.D., on December 12, 2010.  (AR 600).  According to

5  Dr. Ramaswamy's handwritten notes, Plaintiff reported receiving

6  Prednisone but described "pain + swelling + stiffness all over

7  body."  Three days later, however, Plaintiff told her physician

8  at AMG that she felt better after taking Prednisone.[12]  (Compare

9  id. and AR 561).  Plaintiff again told Dr. Ramaswamy she "felt

10 partially better" on March 28, 2011, this time due to taking

11 "MTX."[13]  (AR 639).  She added that she was not experiencing any

12 side effects from her medications.  (Id.).  By May 25, 2011,

13 Plaintiff's condition appears to have improved again, and Dr.

14 Ramaswamy recorded that Plaintiff felt "overall better with

15 current regimen."  (AR 670).  On August 24, 2011, Plaintiff told

16 Dr. Ramaswamy she "was feeling better as long as he [sic] was

17 taking MTX," but that she had run out of the medication two weeks

18 earlier.  (AR 673).  She also admitted to not taking one of her

19 medications, Gabapentin, three times daily as prescribed.  (Id.).

20 \\

21 \\

22 _____

23 [12]  According to Dr. Ramaswamy's notes of a subsequent

24 appointment, on January 29, 2011, Plaintiff said her hands "felt
   better" due to Prednisone, but that this medication "did not

25 help" her shoulders or neck.  (AR 640).

26 [13]  The Court understands "MTX" to be medical shorthand for
   Methotrexate, an anti-inflammatory drug commonly prescribed for

27 rheumatoid arthritis, psoriasis, and certain cancers.  See
   Methotrexate, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/

28 druginfo/meds/a682019.html#why (last visited Sept. 17, 2014).

1  Dr.      Ramaswamy      noted      that      Plaintiff
2  continued to have tender points associated with her fibromyalgia,
3  and increased the dosages of some of Plaintiff's medications.
4  (AR 674).

5

6      **2.   Mental Condition**

7

8          a.   Dr. Oluwafemi Adeyemo

9

10     On December 14, 2010, Dr. Oluwafemi Adeyemo conducted a
11 complete consultative psychiatric evaluation of Plaintiff.  (AR
12 528-32).  During the evaluation, Plaintiff complained that she
13 did not feel well most of the time due to "multiple medical
14 problems."[14]  (AR 529).  She also reported experiencing episodes
15 of anxiety and depression.  (Id.).  However, Dr. Adeyemo noted
16 that Plaintiff was alert, fully oriented, polite, cooperative and
17 able to maintain adequate eye contact.  (AR 531).  Plaintiff's
18 speech was "spontaneous, clear and relevant."  (Id.).
19 Plaintiff's memory and thought processes appeared to be intact.
20 (AR 531).  She reported that she enjoyed reading and watching
21 television and that she helped her children with their

22

23  ─────────────────────
24 [14]   According to Dr. Adeyemo's notes, Plaintiff reported taking
    five medications: Synthroid, Wellbutrin, Cymbalta, Lasix, and
25 Prednisone.  (AR 530).  This list differs from the list AMG
    recorded in an office visit report one day later: Synthroid,
26 Wellbutrin, Cymbalta, Furosemide (Lasix), Ventolin, Symbicort,
    Vicodin, Spiriva, and Naproxen.  (AR 561).  Curiously, AMG's
27 listing of Plaintiff's prescriptions omitted Prednisone even
    though another part of the same visit report mentioned
28 Plaintiff's use of the drug.  (Id.)

homework after she picked them up from school. She also took them to "multiple after school programs or activities" and cooked for her family. (Id.)

Dr. Adeyemo diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood. (Id.). He found that Plaintiff had "mild restrictions in daily activities but does not appear to have any difficulty with social functioning." (AR 532). As a result, although she might have "mild difficulty responding to usual work situations," Plaintiff could understand, retain, and execute simple instructions and "should be able to respond appropriately to co-workers, supervisors, and the public." (Id.). Dr. Adeyemo gave Plaintiff a Global Assessment of Functioning ("GAF") score of sixty-five.[15]    (Id.).

**B.   Non-examining Physicians' Opinions Regarding Plaintiff's Physical Condition**

**1.   Dr. Dan Funkenstein**

On January 11, 2011, non-examining physician Dan Funkenstein, M.D. completed an RFC physical assessment based on a

---

[15]    A GAF score between sixty-one and seventy indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR), 34 (2000).

review of Plaintiff's medical records. (AR 533-46). After reviewing Plaintiff's descriptions of her medical conditions and daily activities, he found her "[p]artially credible, although objective evidence supports some of the allegations it does not fully support all of them." (AR 545). Dr. Funkenstein concluded that Plaintiff had a severe physical impairment, but not at the listing level, and that she had an RFC to perform light work. (AR 545-46). He added that Plaintiff's weight likely contributed to her other conditions. (AR 545).

### 2. Dr. C.C. Scott

On April 6, 2011, non-examining physician C.C. Scott, M.D. affirmed, without elaboration, Dr. Funkenstein's assessment that Plaintiff had an RFC to perform light work. (AR 658).

## C. <u>Non-examining Physicians' Opinions Regarding Plaintiff's Mental Condition</u>

### 1. Dr. Dan Funkenstein

On January 11, 2011, Dr. Funkenstein completed an RFC mental assessment of Plaintiff based on a review of her medical records. (AR 533-46). Dr. Funkenstein's report essentially affirmed Dr. Adeyemo's earlier conclusions. (<u>Compare</u> AR 533-46 <u>and</u> AR 528-32). He concluded that Plaintiff's depression was non-severe and noted that Plaintiff had mild difficulty maintaining social

functioning, concentration, persistence or pace.  (AR 541, 546).
She was mildly restricted in her daily activities.  (AR 546).

**D.    Vocational Expert Testimony**

Vocational Expert ("VE") Sandra Fioretti testified at
Plaintiff's ALJ hearing regarding the existence of jobs in the
national economy that Plaintiff could perform given her physical
and mental limitations.  (AR 60-70).  The VE testified that an
individual with Plaintiff's age, education, experience and mental
and physical limitations would be able to perform light,
unskilled work as a cashier, office helper and information clerk.
(AR 63).  She opined that these jobs existed in significant
numbers in both the national and local economies, and provided
specific job numbers for each occupation.  (AR 63).

The ALJ then posed hypotheticals to the VE.  First, the ALJ
asked if Plaintiff could perform her past work, or any of the
jobs identified, if Plaintiff took a forty-five minute break per
day.[16]  (AR 68-69).  The VE explained that if the breaks were
scheduled, Plaintiff might be able to work in the field of her
training, as a social worker or case work supervisor.  (AR 69).
However, if breaks could not be scheduled, Plaintiff could not
undertake any of her past occupations or the identified jobs.
(Id.).  The ALJ also asked whether Plaintiff would be able to
perform any listed jobs if she had to miss three or more days of

---

[16]    Plaintiff was previously employed as a social worker, social
work manager and school tutor.  (AR 236).

work per month.  (AR 70).  The VE replied that this limitation would eliminate all listed jobs.  (Id.).

**E.   Plaintiff's Testimony**

   **1.      Testimony Before the ALJ**

   During her March 22, 2012 hearing before the ALJ, Plaintiff testified that she usually woke up at eight or eight-thirty a.m., but did not get out of bed until nine-thirty.  (AR 38).  She then took her medications and thought about what dishes she might be able to cook for dinner.  (AR 39).  Other than grocery shopping trips on which her children helped her carry the groceries, Plaintiff testified that "pretty much I sit in the house, I watch TV."  (Id.)  Moreover, her grocery shopping was limited to picking up "milk and bread and small things that we're missing"; otherwise, Plaintiff's husband did the grocery shopping.  (AR 44).

   Nevertheless, Plaintiff also described picking up her two children from school daily and driving them to extracurricular activities twice a week.  (AR 35-37).  She attended her children's baseball and softball games once per week.  (AR 38).  Although she described driving her children to play rehearsals "a few miles away" (AR 52), she also described walking there (AR 40).  Plaintiff volunteered for her daughter's Girl Scout troop for four months in 2010, attending one ninety-minute meeting per week.  (AR 37).  She attended church services about twice per

month.  (AR 39).  "On a good day," she might take her children to McDonald's for ice cream or shop with them at Walmart, where she used an electric cart to move through the store.  (AR 51).  Plaintiff was able to dine out at restaurants approximately every one to three weeks.  (AR 43).  Although Plaintiff said she also took a cane with her when she went shopping, she did not use the cane on the day of the hearing.  (AR 53-54).

Plaintiff told the ALJ that she needed her husband's assistance after using the bathroom and that she showered no more than twice a week, because her husband had to stand by in case she fell.  (AR 41).  However, she was able to bend in order to sort the laundry after it was washed.  (AR 42).  She also planned menus and prepared simple dinners almost daily.  (AR 39, 41).

Plaintiff said that she had tried dieting but "couldn't do it."  (AR 46).  Plaintiff's "real exercise" occurred in her apartment pool because she felt "a lot less pain moving around in the pool."  (Id.).  Plaintiff also stated that losing weight did not always make her feel better. (Id.).

Plaintiff testified that she took Gabapentin and Naproxen for pain, and took Vicodin when the pain got "really severe." (AR 47).  She used a CPAP machine for sleep apnea, but found the machine uncomfortable and avoided using it some nights.  (Id.).  Plaintiff initially stated that she had quit smoking but then acknowledged that she still smoked occasionally, adding "I don't want to be caught in a lie."  (Id.).

1

2       **2.**        **Statements From Plaintiff's Benefits Application**

3

4       Plaintiff made some statements on her Benefits Application

5 that were inconsistent with her testimony before the ALJ. For

6 example, in her Application, Plaintiff stated that she woke up

7 daily at six a.m., rather than eight or eight-thirty. (<u>Compare</u>

8 AR 38 <u>and</u> AR 243). Plaintiff's Application described her as

9 spending much of a typical day at home, except for her daily

10 drive to pick up her children at school. (AR 243). This

11 differed from her testimony to the ALJ, during which Plaintiff

12 described driving her children to a variety of activities and

13 walking them to others, including outdoor sports and rehearsals

14 for a play.[17] (AR 40). In the Application Plaintiff stated that

15 she was able to pursue her scrapbooking hobby only once per

16 month, due to an inability to concentrate. (AR 247). However,

17 she told the ALJ she scrapbooked "[a] couple of times a week

18 probably." (AR 40). Plaintiff made no mention in her

19 Application of having to limit her shopping trips to purchasing

20 "small things," as she later told the ALJ, and instead described

21 shopping for "food/household items, things my children need for

22 school, clothes." (<u>Compare</u> AR 44 <u>and</u> AR 246).

23 \\

24 \\

25 _____

26 [17] Although she told the ALJ that she walked her children to these

27 activities, Plaintiff did not check a box on the Application
indicating that she walked on some of her trips out of the house.

28 (AR 246). She also indicated that walking caused her pain and
shortness of breath (AR 248).

**F.    Richard Hinrichs's Third Party Function Report**

On August 18, 2010, Plaintiff's husband, Richard Hinrichs, completed a Third Party Function Report.  (AR 258-65).   He explained that it was difficult for Plaintiff to get out of bed in the morning.  (AR 258).  When she finally got out of bed, she took her medications.  (Id.).  Plaintiff was able to do light chores, but needed to rest after completing them.  (AR 258). Plaintiff was able to do laundry with the help of her children. (AR 260).  Mr. Hinrichs explained that Plaintiff could microwave her meals and also cared for their two children.  (AR 258).

Mr. Hinrichs stated that his wife had difficulty breathing. (AR 260).  He also explained that Plaintiff's breathing device caused her pain and she could not sleep for more than two hours at a time.  (AR 259).  Mr. Hinrichs explained that Plaintiff was able to drive and bought "small perishables" from the grocery store, using an electric cart when shopping.  (AR 261).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, "a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months." Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C.

17

1    § 423(d)(1)(A)).    The  impairment  must  render  the  claimant

2    "incapable  of  performing  the  work  she  previously  performed  and

3    incapable  of  performing  any  other  substantial  gainful  employment

4    that  exists  in  the  national  economy."   <u>Tackett v. Apfel</u>, 180 F.3d

5    1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

6

7         To determine whether a claimant is entitled to benefits, an

8    ALJ  conducts  a  five-step  inquiry.    20  C.F.R.  §§  404.1520,

9    416.920.  The steps and their related inquiries are as follows:

10

11        (1) Is the claimant presently engaged in substantial

12             gainful activity?  If so, the claimant is found

13             not disabled.  If not, proceed to step two.

14        (2) Is the claimant's impairment severe?  If not, the

15             claimant is found not disabled.  If so, proceed

16             to step three.

17        (3) Does the claimant's impairment meet or equal one

18             of  the  specific  impairments  described  in  20

19             C.F.R.  Part  404,  Subpart  P,  Appendix  1?   If  so,

20             the claimant is found disabled.  If not, proceed

21             to step four.

22        (4) Is  the  claimant  capable  of  performing  his  past

23             work?  If so, the claimant is found not disabled.

24             If not, proceed to step five.

25        (5) Is  the  claimant  able  to  do  any  other  work?   If

26             not,  the  claimant  is  found  disabled.   If  so,  the

27             claimant is found not disabled.

28

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1099, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

\\

\\

\\

1                              **V.**

2                      **THE ALJ'S DECISION**

3

4        The ALJ employed the five-step sequential evaluation process

5   and concluded that Plaintiff was not under a disability within

6   the meaning of the Social Security Act from June 3, 2010, through

7   the date of the ALJ's decision on April 13, 2012.  (AR 21).  At

8   step one, the ALJ found that Plaintiff had not engaged in

9   substantial gainful employment since June 3, 2010. (AR 12).  At

10  step two, the ALJ found that Plaintiff had the severe impairments

11  of fibromyalgia, chronic obstructive pulmonary disorder, sleep

12  apnea, and cancer of the thyroid (status post thyroidectomy as of

13  July 2008), as well as obesity.  (20 C.F.R. § 404.1520

14  404.1520(c)).  (Id.).  However, at step three, the ALJ found that

15  Plaintiff did not have an impairment or combination of

16  impairments that met or medically equaled one of the listed

17  impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20

18  C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (AR 15).[18]  The ALJ

19  noted that there is no medical listing for either fibromyalgia or

20  obesity and that Plaintiff's impairments, "considered singly and

21  in combination, do not meet or medically equal the criteria of

22  any medical listing."  (Id.).  The ALJ then found that Plaintiff

23  had the following RFC:

24  \\

25  \\

26

27  _____
    [18]   A physical or mental impairment is considered "severe" if it

28  "significantly limits [the claimant's] physical or mental ability
    to do basic work activities."  20 C.F.R. § 404.1520

                                20

> 1    [Plaintiff] has the residual functional capacity to
> 2    perform light work as defined in 20 C.F.R. §
> 3    404.1567(b) and [Social Security Rulings ("SSR")] 83-10
> 4    specifically as follows:  the claimant can lift and/or
> 5    carry twenty pounds occasionally and ten pounds
> 6    frequently; she can stand and/or walk for six hours out
> 7    of an eight-hour workday with regular breaks; she can
> 8    sit for six hours out of an eight-hour workday with
> 9    regular breaks; she can never climb ladders, ropes, or
> 10   scaffolds; she can occasionally climb ramps and stairs,
> 11   balance, stoop, kneel, and crouch; she can never have
> 12   exposure to work at unprotected heights; she can
> 13   occasionally be exposed to environmental irritants,
> 14   such as dust, odors, gases, and fumes; she can
> 15   occasionally reach overhead bilaterally; and she is
> 16   limited to four to five step instructions due to
> 17   fatigue associated with physical impairments.

(Id.).  In reaching this finding, the ALJ stated that she had considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p. (Id.).  The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.  (Id.).

\\

\\

21

1    The ALJ found that the claimant's subjective allegations
2    were "less than fully credible." (AR 17). In making this
3    finding, the ALJ gave great weight to Plaintiff's own description
4    of her daily activities, stating that she had "engaged in a
5    somewhat normal level of daily activity and interaction." (Id.).
6    The ALJ observed that Plaintiff's daily activities included
7    "preparing meals, completing light household chores, driving
8    [and] attending her children's extracurricular activities,
9    grocery shopping and attending church." (Id.). The ALJ reasoned
10   that Plaintiff's conservative treatment plan suggested that her
11   symptoms and limitations were not as severe as alleged. (Id.).
12   Perhaps most significantly, the ALJ's review of Plaintiff's
13   treatment and medication regime revealed that both had been
14   "relatively effective in controlling [her] symptoms." (Id.).

15

16   Additionally, the ALJ found that Mr. Hinrichs's Third Party
17   Function Report was not credible for several reasons. In
18   particular, she opined that Mr. Hinrichs provided little more
19   than a "parroting of the subjective complaints already testified
20   [by] [Plaintiff]." (Id.). Moreover, the ALJ rejected Mr.
21   Hinrichs's observations as unsupported by the clinical and
22   diagnostic medical evidence in the record. (Id.).

23

24   At step four, the ALJ determined that Plaintiff was unable
25   to perform any of her past relevant work as defined by 20 C.F.R.
26   § 404.1565. (AR 19). However, based on the testimony of VE
27   Sandra Fioretti, the ALJ found that considering Plaintiff's age,
28   education, work experience and RFC, Plaintiff could perform jobs

1    that existed in significant numbers in the national economy.  (AR

2    20-21).   The ALJ specifically asked the VE whether Plaintiff's

3    "additional limitations," though not among the listed impairments

4    justifying a disability ruling, might prevent Plaintiff from

5    pursuing these otherwise available jobs, which included working

6    as a cashier, office helper, or information clerk.  (Id.)  The VE

7    responded that these representative occupations would still

8    remain available to Plaintiff.   (AR 20, 63).   In sum, the ALJ

9    found that Plaintiff was not under a disability as defined by 20

10   C.F.R. 404.1520(g).  (AR 21).

11

12                                **VI.**

13                        **STANDARD OF REVIEW**

14

15       Under 42 U.S.C. § 405(g), a district court may review the

16   Commissioner's decision to deny benefits.  "The court may set

17   aside the Commissioner's decision when the ALJ's findings are

18   based on legal error or are not supported by substantial evidence

19   in the record as a whole."  Aukland v. Massanari, 257 F.3d 1033,

20   1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

21   v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

22   Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

23

24       "Substantial evidence is more than a scintilla, but less

25   than a preponderance."  Reddick, 157 F.3d at 720 (citing Jamerson

26   v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant

27   evidence which a reasonable person might accept as adequate to

28   support a conclusion."  Id.  To determine whether substantial

                                 23

evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" <u>Aukland</u>, 257 F.3d at 1035 (quoting <u>Penny v. Sullivan</u>, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**VII.**

**DISCUSSION**

Plaintiff challenges the ALJ's decision on three grounds. First, Plaintiff contends that the ALJ mischaracterized medical evidence favorable to Plaintiff and failed to properly consider the relevant medical evidence in her assessment of Plaintiff's RFC. (Memorandum in Support of Plaintiff's Complaint ("MSPC") at 3).  Second, Plaintiff contends that the ALJ failed to properly consider Plaintiff's subjective complaints and assess her credibility. (MSPC at 5).  Third, Plaintiff argues that the ALJ failed to provide clear and convincing reasons for rejecting the Third Party Function Report. (MSPC at 8).

The Court disagrees with all three contentions.  The ALJ's RFC determination was supported by substantial evidence. Furthermore, the ALJ offered clear and convincing reasons supported by substantial evidence for finding Plaintiff's

24

1  subjective testimony less than fully credible.  Additionally, the
2  ALJ properly considered Mr. Hinrichs's Third Party Function
3  Report.  Accordingly, for the reasons discussed below, the ALJ's
4  decision must be AFFIRMED.

5

6  **A.    The ALJ's RFC Determination Was Supported By Substantial**
7  **Evidence**

8

9      Plaintiff contends that the ALJ failed to properly consider
10 all of the relevant medical evidence in determining Plaintiff's
11 RFC.  (MSPC at 3).  Specifically, Plaintiff argues that the ALJ
12 failed to consider medical evidence that showed Plaintiff's
13 condition was worsening.  (Id.).  Plaintiff contends that this
14 purported failure to properly consider the medical evidence
15 constitutes reversible error.  The Court disagrees.

16

17     Social Security regulations require the ALJ to consider all
18 relevant medical evidence when determining whether a claimant is
19 disabled.  20 C.F.R. §§ 404.1520(b), 416.927(c).  Furthermore,
20 "[t]he ALJ is responsible for determining credibility, resolving
21 conflicts in medical testimony, and for resolving ambiguities."
22 Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see also
23 Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he
24 ALJ is the final arbiter with respect to resolving ambiguities in
25 the medical evidence.").  Findings of fact that are supported by
26 substantial evidence are conclusive. 42 U.S.C. § 405(g); see also
27 Kay v. Heckler, 754 F.2d 1545, 1549 (1985) ("Where the evidence
28 as a whole can support either a grant or a denial, [the court]

1   may not substitute [its] judgment for the ALJ's."); Ryan v.

2   Comm'r, 528 F.3d 1194, 1198 (9th Cir. 2008) ("Where evidence is

3   susceptible to more than one rational interpretation,' the ALJ's

4   decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d

5   676, 679 (9th Cir. 2005)).

6

7      An ALJ may not select only the facts that support her

8   decision, omitting facts favorable to the claimant. Reddick, 157

9   F.3d at 722-23 (impermissible for an ALJ to develop evidentiary

10   basis by "not fully accounting for the context of materials or

11   all parts of the testimony and reports"); Gallant v. Heckler, 753

12   F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore

13   competent evidence in the record in order to justify her

14   conclusion). Moreover, even where one of a claimant's medical

15   conditions does not meet the listing criteria for a disabling

16   impairment, the ALJ must still consider the condition's effect in

17   combination with the other alleged illnesses. Celaya v. Halter,

18   332 F.3d 1177, 1181-82 (9th Cir. 2003). Thus, for example, where

19   a claimant's obesity is severe but not disabling on its own, the

20   ALJ must nevertheless consider the

21   obesity's interaction with the claimant's other conditions, such

22   as diabetes. Id. at 1182; cf. Burch v. Barnhart, 400 F.3d 676,

23   682 (9th Cir. 2005) (distinguishing Celaya and concluding that a

24   multiple impairment analysis is not required where "the medical

25   record is silent as to whether and how claimant's obesity might

26   have exacerbated her condition" and "the claimant did not present

27   any testimony or other evidence . . . that her obesity impaired

28   her ability to work.").

1

2       The ALJ must also resolve conflicting medical evidence.  See

3  Batson v. Comm'r, 359 F.3d 1190, 1195 (9th Cir. 2004); Benton ex.

4  rel Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  An

5  ALJ  need  not  address  every  piece  of  evidence  in  the  record,

6  however, but only evidence that is significant or probative.  See

7  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir.

8  2006).  If the administrative process resulted in error that is

9  merely harmless, the claimant is not entitled to a remand.  See

10  Carmickle  v.  Comm'r,  533  F.3d  1155,  1162  (9th  Cir.  2008)

11  (harmless  error  rule  applies  to  review  of  administrative

12  decisions regarding disability).

13

14       Here, the ALJ did not ignore medical evidence that might

15  have  shown  Plaintiff's  condition  was  worsening,  as  Plaintiff

16  contends.  To the contrary, the ALJ considered such evidence and

17  discussed it at length.  (See, e.g. AR 18, in particular ¶¶ 1-6;

18  AR 19, ¶¶ 1-2).  Having also assessed the conflicting evidence at

19  length  and  in  detail,  the  ALJ  found  "substantial  evidence"

20  weighing  against  a  finding  that  Plaintiff  is  disabled.   See

21  Aukland, 257 F.3d at 1035 (internal citation omitted).

22

23       Plaintiff  suggests  that  the  ALJ's  failure  to  discuss

24  Plaintiff's August 2, 2010 doctor visit, which revealed plus-two

25  edema  in  her  bilateral  lower  extremities,  shows  that  the  ALJ

26  failed  to  consider  evidence  that  Plaintiff's  health  was

27  worsening.  (MSPC at 3).  However, Plaintiff, herself did not

28  include edema as a condition limiting her ability to work on her

disability report. (AR 226). Despite this omission, the ALJ accounted for Plaintiff's edema multiple times. For example, the ALJ noted that on March 17, 2010, Plaintiff had "[plus one] pitting edema at the ankles." (AR 18). The ALJ also gave great weight to Dr. Funkenstein's report, which acknowledged Plaintiff's edema five times. (AR 544-45). The ALJ fully considered the existence and extent of Plaintiff's edema, concluding, based on the medical evidence, that it was not severe. (AR 12). Incorporated into this finding is the ALJ's repeated observation that Plaintiff's daily activities were compatible with light work. See, e.g. AR 17 (Plaintiff's described physical and mental capabilities "replicate those necessary for obtaining and maintaining employment"); AR 19 (RFC is supported by evidence as a whole).

Moreover, the treating physician's additional findings at the same August 2, 2010 examination favored a finding that Plaintiff faced fewer physical limitations, not more. Including more details of that examination, as Plaintiff seems to request, would only weaken Plaintiff's argument. For example, AMG's treating physician found that Plaintiff did not exhibit respiratory abnormalities despite her earlier COPD diagnosis, recorded that Plaintiff denied pain in her extremities, and found that Plaintiff was "negative for fatigue." (AR 524-25). The Court must consider these observations since they were within the body of evidence the ALJ considered in rendering her decision.

1    In addition, the ALJ appropriately considered medical
2    evidence showing that Plaintiff's conditions were well-managed,
3    at least in part, by medications and that Plaintiff's condition
4    was, at times, improving.  This evidence includes a series of
5    Plaintiff's own reports to her physicians, beginning in December
6    2010, in which she described either partial or "overall"
7    improvement due to her prescribed use of Prednisone,
8    Methotrexate, and other medications.  (See Parts A(1)(c) & (d)
9    supra).  The ALJ also considered Plaintiff's "severe" impairments
10   as they acted in combination, and not just individually,
11   including Plaintiff's obesity.   See, e.g. AR 18 (ALJ's
12   consideration of Plaintiff's obesity as it affected her ability
13   to "ambulate" and her other body systems; ALJ's consideration of
14   effect of sleep apnea and fibromyalgia on claimant's other
15   conditions and functional limitations).  As noted above, the
16   evidence in the record demonstrated that Plaintiff worked as a
17   social worker for many years before moving to California and the
18   evidence indicates that she was obese during at least some of
19   this time.  Accordingly, the evidence would support a finding
20   that her obesity did not prevent her from working.  (See AR 237,
21   274, 530).

22

23   After reviewing the ALJ's decision and based on the
24   foregoing, the Court finds that the ALJ's RFC determination was
25   supported by substantial evidence.

26

27

28

**B.** **The ALJ Offered Clear And Convincing Reasons Supported By Substantial Evidence For Finding Plaintiff's Subjective Testimony Less Than Fully Credible**

Plaintiff contends that the ALJ erred by failing to articulate clear and convincing reasons for finding Plaintiff's subjective testimony less than fully credible. (MSPC at 8). The Court disagrees. The ALJ's decision contains extensive citation to and discussion of clear and convincing reasons supported by substantial evidence for rejecting Plaintiff's testimony.

When assessing a claimant's credibility, the ALJ must engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (Id.). If such evidence exists, the ALJ must make specific credibility findings in order to reject the claimant's testimony. (Id.). The ALJ may use "ordinary techniques of credibility evaluation" during this inquiry. Smolen, 80 F.3d at 1284. The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately explained or unexplained failure to pursue or follow treatment. Tommasetti, 533 F.3d at 1039. Additionally, the ALJ may use evidence of the claimant's ability to perform daily activities that are transferrable to the workplace to discredit her testimony about an inability to work. Morgan v. Comm'r, 169 F.3d 595, 600 (9th Cir. 1999).

1    As noted above, to determine whether the record presents

2  "substantial evidence" to support or reject the Commissioner's

3  findings, the Court considers "the record as a whole." Aukland,

4  257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

5  Cir. 1993)).  To be substantial, the evidence must be "more than

6  a scintilla, but less than a preponderance." Reddick, 157 F.3d

7  at 720 (citing Jamerson, 112 F.3d at 1066).

8

9    Here, there was medical evidence of impairment.  However,

10  the ALJ articulated specific, clear and convincing reasons for

11  discounting Plaintiff's testimony about the severity of her

12  physical symptoms.  First, the ALJ cited Plaintiff's daily

13  activities as an indication that her testimony was unreliable.

14  The ALJ noted that Plaintiff prepared meals, completed light

15  household chores, drove her children to extracurricular

16  activities, attended those activities, shopped for groceries and

17  attended church.  (AR 17).  The ALJ further emphasized that

18  "despite [Plaintiff's] impairments, she ha[d] engaged in a

19  somewhat normal level of daily activity and interaction." (Id.).

20  Plaintiff, herself, had described these activities not only to

21  the ALJ but also during her psychiatric evaluation by Dr.

22  Adeyemo.  (See AR 597).

23

24    The Court agrees with the ALJ's finding that Plaintiff's

25  daily activities, both while she was still employed and after the

26  alleged onset date, render her allegations of disabling fatigue

27  and pain questionable.  On her Benefits Application, Plaintiff

28  described forcing herself to continue working despite "feeling

awful most days and being late to work on many occasions." (AR
226).   She told the ALJ that prior to her resignation, she
regularly arrived at work one to two hours late and was "starting
to get in trouble" for working from home at times.   (AR 56).
Yet, Plaintiff's October 2009 work evaluation noted with approval
that Plaintiff "works her scheduled hours and often fields calls
from home," and praised Plaintiff for becoming more rather than
less punctual.   (AR 277).   The same evaluation noted that
Plaintiff had only four recorded absences during 2009.   (Id.)
Not until her husband found a new job did Plaintiff resign and
apply for disability benefits.   (AR 226).

     Similarly, Plaintiff claimed that she was constantly
fatigued during 2010, and yet she found the energy to leave her
house for a number of reasons every day.   (AR 35-37, 40).
Plaintiff walked and drove to her children's many extra-
curricular activities, regularly shopped for groceries and other
household goods, dined in restaurants, and completed a number of
household chores on a daily or semi-regular basis.   (See
generally AR 35-51).   The extent of Plaintiff's activities, both
in and outside of her home, undermines her subjective complaints.

     It was proper for the ALJ to rely on and cite evidence of
Plaintiff's daily activities in evaluating whether her subjective
testimony was credible.   See, e.g., Smolen, 80 F.3d at 1284 (ALJ
may consider claimant's daily activities in evaluating testimony
as to severity of symptoms); Morgan, 169 F.3d at 600 (ALJ may
discount claimant's testimony where her normal activities can

transfer to the work setting); Fair, 885 F.2d at 603 (daily activities may be reason to discredit excess pain allegation where claimant spends substantial part of the day performing activities that may transfer to a work setting).

Additionally, the ALJ appropriately cited inconsistencies between Plaintiff's testimony and the objective medical evidence. (AR 17). An ALJ may consider such inconsistencies as one factor, among many, bearing on the credibility of a plaintiff's subjective testimony. See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-60 (9th Cir. 2002) (ALJ properly considered the lack of objective medical evidence, as well as other factors, in evaluating the credibility of a plaintiff's subjective testimony regarding the severity of her impairments and pain); Morgan, 169 F.3d at 599-600 (same).

The ALJ noted numerous inconsistencies between Plaintiff's testimony and the objective medical evidence, which called into doubt the physical limitations Plaintiff alleged.[19]   The ALJ explained that Plaintiff's treatment had been essentially routine and conservative in nature, and that the lack of aggressive treatment or surgical intervention suggested Plaintiff's "symptoms and limitations were not as severe as she alleged."

---

[19]    The Court notes that the ALJ omitted mention of at least one claim by Plaintiff that further calls her credibility into question: her statement to the AMG physician, on March 2, 2012, that she had "never tried to stop smoking" and was still smoking as of that date.  (AR 684).  This admission directly contradicted Plaintiff's numerous statements to other physicians that she quit smoking on February 14, 2010.  (See, e.g. AR 389, 423).

(AR 17).   To counter this finding, Plaintiff argues that a doctor's prescription for Methotrexate, Prednisone, or Vicodin "cannot be considered as conservative forms of treatment." (MSPC at 5).  Plaintiff offers no facts to substantiate this statement, however, and the Court observes that Plaintiff testified that she only took Vicodin when her pain was "really severe."  (AR 47). Nor is Plaintiff's assertion that she "consistently reported fatigue" (MSPC at 6) accurate, as the records of her August 2 and 14, 2010 physician visits reveal that she was "negative for fatigue" on those occasions, while seeking treatment for other conditions.  (AR 521, 524).

     Furthermore, the records cited by the ALJ (AR 18) indicate that Plaintiff's medication and treatment have been relatively successful in managing her symptoms.  For example, on December 15, 2010, Plaintiff reported feeling better after taking Prednisone.  (AR 561).  On May 25, 2011, and August 24, 2011, Plaintiff again reported improvement due to the effectiveness of her medications.  (AR 670).  Plaintiff also indicated that she experienced no side effects from her medications.  (AR 639). Plaintiff told Dr. Maguire that she experienced a "remarkable," if temporary, improvement in her shortness of breath while using the CPAP machine (AR 418), though she sometimes avoided using it because doing so was uncomfortable.  (AR 47).  Finally, Plaintiff testified that taking a water pill and wearing stockings were relatively effective treatments for her edema.  (AR 49).  In sum, the record supports the ALJ's conclusion that Plaintiff's medication and treatment were relatively effective in treating

her symptoms.    After reviewing the ALJ's decision and based on the foregoing, the Court finds that the ALJ provided sufficiently clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's subjective statements.

**C.    The ALJ Properly Considered Richard Hinrichs's Third Party Function Report**

Plaintiff argues that the ALJ failed to properly assess the testimony and statements of Plaintiff's husband, lay witness Richard Hinrichs.   (MSPC at 8).   When determining a claimant's disability, an ALJ is "required to consider and comment upon competent lay testimony, as it concern[s] how [the claimant's] impairments impact his ability to work." Bruce v. Astrue, 557 F.3d 1113, 1115-16 (9th Cir. 2009).   Disregarding the testimony of a plaintiff's friends or family members without adequate justification violates 20 C.F.R. § 404.1513(e)(2)(1991).   Smolen, 80 F.3d at 1288.   However, the ALJ may reject lay testimony provided that she gives "reasons for doing so that are 'germane to the witness.'"  Carmickle, 533 F.3d at 1164 (quoting Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).   "Inconsistency with medical evidence is one such reason." Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (internal citation omitted).   It is proper for an ALJ to reject lay witness testimony or portions of lay witness testimony that conflict with the objective medical evidence or the plaintiff's daily activities.   Id.

1    The ALJ proffered two reasons for rejecting Mr. Hinrichs's
2  testimony.  First, the ALJ concluded that the medical evidence
3  conflicted with Mr. Hinrichs's Third Person Function Report.
4  Second, the ALJ emphasized that Mr. Hinrichs's testimony appeared
5  to be no more than a "parroting" of Plaintiff's subjective
6  complaints.  (AR 17).  Both were legitimate reasons for rejecting
7  Mr. Hinrich's testimony.

8

9    As discussed above, the medical evidence the ALJ considered
10 and discussed at length indicated that Plaintiff did not suffer
11 from disabling limitations, and that Plaintiff's medication and
12 treatment were moderately successful in treating her symptoms.
13 (AR 18-19).  Mr. Hinrichs failed to acknowledge the effect of
14 medications on his wife's symptoms or the evidence of improvement
15 in the record.

16

17    Moreover, Mr. Hinrichs essentially repeated his wife's
18 description of both her symptoms.  (See AR 258-65).  In addition
19 to rejecting lay testimony that is inconsistent with medical
20 evidence, the ALJ may reject third party testimony that does not
21 add new substance to a claimant's testimony.  See Molina, 674
22 F.3d at 1117 ("Where lay witness testimony does not describe any
23 limitations not already described by the claimant, and the ALJ's
24 well-supported reasons for rejecting the claimant's testimony
25 apply equally well to the lay witness testimony, it would be
26 inconsistent with our prior harmless error precedent to deem the

27

28

ALJ's failure to discuss the lay witness testimony to be prejudicial per se."). Therefore, remand is not required on this ground.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:  September 29, 2014

_____
/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE